**IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**THOMAS C. BLOOM,**
    **Plaintiff,**

v.                                  **Civil Action No.: 1:13cv128**

**THE BOARD OF EDUCATION
OF MONONGALIA COUNTY, et al.,**
    **Defendants.**

<u>**REPORT AND RECOMMENDATION**</u>
<u>I.</u>
<u>Procedural History</u>

Plaintiff, Thomas C. Bloom, is a long time guidance counselor with the Monongalia County Board of Education. While working for the Board of Education, Bloom filed as a candidate for an open seat on the Monongalia County Commission. After being elected to the office, Bloom discovered he could not convince the County Commission to move its meeting times to evenings thereby permitting Bloom to attend without jeopardizing his employment as a guidance counselor. Bloom requested use of flex time or unpaid leave in order to make daytime meetings of the Commission. The Board, via the MHS principal and thereafter the Superintendent of Schools refused.

Bloom filed suit in the Circuit Court of Monongalia County alleging violations of his 1st Amendment rights of speech, assembly and association, 14th Amendment rights, and rights under 1983 as well as state claims.

Defendants removed the action to the District Court April 25, 2012. April 29, 2013 Bloom filed his Motion For Preliminary Injunction [DE4]. By Order dated May 15, 2013 [DE 11] Bloom's Motion to Amend/Correct his previously filed Motion For Preliminary Injunction was granted and the Amended Motion was filed [DE 12]. Hearing on the motion for preliminary injunction was

continued from dates set several times. By Order dated July 18, 2013 the hearing was rescheduled for September 12, 2013 [DE 49]. By Order entered September 11, 2013, the hearing on the preliminary injunction was referred to the undersigned Magistrate Judge. [DE 70]. On September 12, 2013 came the Plaintiff, Plaintiff's counsel and Defendants and their counsel for hearing on the motion for preliminary injunction. The undersigned received testimony from witnesses and exhibits. Thereafter, the undersigned took the matter under consideration.

II.
Facts

The undersigned finds the following to be the relevant facts elicited from the testimony of the witnesses and exhibits offered during the hearing:

Bloom has been employed by the Monongalia Board of Education [Board] from August 22, 1977 to present. Between 1977 and the end of the school year 2011 Bloom was employed as a guidance counselor at University High School [UHS]. Prior to the November 6, 2012 general election, Bloom announced his intention to seek election to the Monongalia County Commission [Commission]. Bloom was aware the Commission traditionally held its meetings on Wednesdays at 10:00 a.m[1].

Prior to announcing his candidacy, Bloom described his relationship with his Board employers as exceptional. He was then working at UHS under a principal who had been there about 4 months. After announcing his candidacy, Bloom stated he was told by the UHS principal he could not leave the campus during work hours for any reason. He was written up for various infractions 8 different times.

At the time he filed his pre-candidacy [November 2011] Bloom was aware the duties of the

---

[1]Not all county commissions hold their meetings in the day time. Between 10 and 15 of the 55 county commissions hold their meetings in the evenings.

Commission may interfere with his duties as a school guidance counselor,. However, he did not go to the Board or his principal. He reasoned: 1) he did not have a good relationship with his principal; and 2) he did not feel he needed to ask since he had not won election.

Bloom applied, was interviewed, and accepted for transfer of employment to Morgantown High School [MHS] as a guidance counselor. The transfer became effective at the start of the 2012-2013 school year. Bloom continued as the girls tennis coach at UHS.

Bloom and his principal at MHS agree that Bloom mentioned from time to time that he was seeking election. They also concur that when asked how Bloom was going to work out the schedule, his early response was that he was going to get the Commission to change the meeting time so he could attend.

Bloom is contracted to work for the Board 210 days as a salaried employee. He does not receive overtime compensation. He does not "punch a clock" to get paid. Bloom arrives for work around 6:45 am daily. Morning is the most critical time for a guidance counselor to be available to his students. Students often arrive at school in crisis from events which have occurred outside of school over night. Social media has exacerbated these morning crises. Notwithstanding that the morning is the most critical time, students seek assistance from their guidance counselors at different times during the school day. They also seek such assistance after school hours. Some matters are more urgent than others. For a student in crisis contemplating suicide, every minute counts. There are 5 guidance counselors employed at MHS. Each has approximately 400 students assigned to him or her. Each takes a specific grade level so he or she can follow the same students for all four years to graduation. [Plaintiff's Exhibit 17, p. 22].

Part of Bloom's early campaign platform was to change Commission meetings to evening hours. He believed this would encourage attendance and public participation by those who were

working and unable to attend daytime sessions. He posted his campaign platform on "Facebook." The first plank of his platform as posted states: "1)Moving the meetings from Wednesday morning to the evening - with 96% of the residents working, it is not realistic to attend the meetings." Defendants' Exhibit 1.

County Commissioner Eldon A. Callen [Callen] met with each of the candidates[2] prior to the election to tell them what they were getting into if elected. In his April and May 2012 conversations with Bloom, Callen told Bloom he was opposed to changing the meeting time. He asked Bloom to drop the idea of moving it to evening time. He told Bloom of the problems created by holding meetings later in the day. They included: 1) the difficulty of getting other elected officials and their staffs to attend meetings after hours; 2) the difficulty with paying overtime to those non-elected personnel who needed to be present for meetings after work hours; 3) the difficulty with security caused by holding meetings after hours; and 4) the difficulty with issuing a ruling and expecting the officials and staff not present to carry it out without being able to have input in the decisional process. In response, Bloom told Callen he had it worked out that he would get off work to attend commission meetings. Callen did not believe Bloom was being realistic. He believed Bloom did not understand the time required for Commission business.

The Commission is composed of three elected county commissioners. Two of the other commissioners are Jim Bartolo and Eldon Callen. Any commissioner can bring a matter before the Commission by placing it on the meeting agenda. It takes a majority to pass any resolution including one to change the Commission meeting time.

Commission meetings generally take between 1.5 and 4 hours. Regular meetings are

---

[2]There were 6-7 candidates running for the vacant Commission seat in the 2012 election. One of the other candidates running for county commission in the 2012 election was Statler, a prior member of the Monongalia Board of Education.

followed by work sessions that average 4 hours in length. Work sessions are never less than 1.1 hours in length. On average Callen spent 45 hours per week in 2010, 25 hours per week in 2011, and has spent 30 hours per week since 2012 on Commission business.

With the Commission meetings at 10:00 am, other elected officials and their staff are able to attend the meetings during regular work hours and share ideas. This cooperative spirit has been developed between the Commission and other elected officials over the past several years. Callen believes this cooperative spirit has benefitted the Commission, county and citizens.

The Board did not attempt to prevent or prevent Bloom from running for public office. The Board did not attempt to prevent or prevent Bloom from being elected to public office.

Bloom mentioned weekly that he was running for elected office. MHS principal DeSantis testified he did not tell Bloom leave policies were unavailable to him prior to the election. DeSantis testified he had no need to tell his this because Bloom told him he was planning to move the Commission meetings to the evening time. If that occurred, attending Commission meetings would not interfere with Bloom's duty time at the school. DeSantis had no reason to doubt Bloom's word.

Bloom was elected November 8, 2012, took the oath of office, and assumed his seat January 2, 2013. The day after the election, Bloom came in to school excited and talked with principal Robert L. DeSantis. What specifically was discussed is subject to the differing interpretations of Bloom and DeSantis. Generally there was discussion concerning how Bloom was going to handle attending Commission meetings and attend to his duties as guidance counselor. Bloom says DeSantis told him "his problems were just beginning." DeSantis does not deny the comment. He explains that he meant that a new attorney general had been elected in the same election. He questioned whether the new attorney general would be as willing to rule that Bloom could take off school to attend to commission meetings as Bloom had thought the old attorney general was.

DeSantis recalls Bloom telling him he had enough votes on the Commission to move the meetings to the evening and even if that did not work out, he could get a ruling from the Attorney General and/or the State Superintendent of Schools that would permit him to take time off school to attend to Commission meetings and other duties. Bloom testified he told DeSantis he would use flex time. He says DeSantis did not say anything. Instead, Bloom says DeSantis told him to put his request in writing. DeSantis testified he has never told Bloom or any professional they could use flex time. DeSantis did not believe it was proper for Bloom to leave school to attend to duties at the Commission.

During the period of time preceding and post dating Bloom's election to the Commission several Board Policies were in effect: File 7-15 "Personal Leave And Other Absences" [Plaintiff's Exhibit 1]; File 7-16 "Unpaid Leaves Of Absence" [Plaintiff's Exhibit 2]; and File 7-30 "Work Week / Overtime" [Plaintiff's Exhibit 3]. During the same period guidance counselors in the State of West Virginia and their employer Boards were subject to West Virginia Code, Chapter 18, Article 5, Section 18b.

As a result of DeSantis telling Bloom to put his request in writing, Bloom's lawyer [Ford] wrote a letter to DeSantis dated December 20, 2012 suggesting that Paragraph 8[3] of File 7-30 had been "liberally used by other school administrators for school personnel, as well as by Board employees" and asked that the Board grant Bloom "Flex time for the time necessary during school hours to attend County Commission meetings and other necessary Commission functions that might

_____

[3]Paragraph 8: "FLEX TIME: The superintendent or his designee, department heads/principals, may authorize 'flex time' or a schedule change for an employee to complete his/her duties within a given workweek, provided that the total hours worked does not exceed the contracted hours within that work week. The employee's timesheet must list all flex time hours earned on the date it was earned and all flex time hours used on the date it was taken. Flex time is calculated hour for hour. Flex time must be used within the week that it is earned. Substitutes will not be call when using flex time."

occur." Plaintiff's Exhibit 1. DeSantis told the superintendent about the request and that he [DeSantis] did not believe Bloom should be allowed to leave school using flex time to attend to duties at the Commission. According to Bloom, he received no pressure from the superintendent and that the superintendent told DeSantis he would support his decision.

In early January 2013 the Commission met and temporarily moved its meeting time from 10:00 am to 3:00 pm "to accommodate Commissioner Bloom until this matter is resolved." Plaintiff's Exhibit 7.

January 3, 2013 Robert L. DeSantis wrote Bloom declining the request for flex time every Wednesday "so that you may attend meetings of the Monongalia County Commission. The immediate needs and concerns of the students you serve at Morgantown High School are my number one priority and I feel we need a full time counselor here to work with this large population of students during the school day." Plaintiff's Exhibit 8.

The remaining 4 MHS guidance counselors told DeSantis they are not willing to cover Bloom's student case load so he can be away from school to attend to another job. DeSantis expresses concern that a student in crisis who had developed a relationship with Bloom would not want to deal in confidence with another counselor and / or that the other counselor would not want to take over the student's situation in order to assist that student in crisis.

January 23, 2013 Superintendent Devono wrote to the County Administrator of the Monongalia County Commission thanking the Commission for changing their meeting time to 3:00 thus accommodating Bloom and "his pledge to change the meeting times ... to accommodate more attendance by the public" and make the contributions to both the education arena and to the "area of his elected service as a County Commissioner. Your altered meeting times have maximized his opportunities for his service and minimized any potential scheduling conflicts with his roles as an

educator." Plaintiff's Exhibit 9.

Subsequent to the Devono letter of January 23, 2013, the Commission extended the change of meeting time for another 4 weeks.

February 28, 2013 Bloom communicated his intent to Robert DeSantis to take one half days off without pay for the purpose of attending meetings of the county commission. DeSantis wrote Bloom on March 12, 2013 denying Bloom's request/intent explaining "[t]here are no Monongalia Board of Education policies that permit full-time employees to unilaterally elect to take time-off without pay for the purpose of attending to outside activities." Plaintiff's Exhibit 10.

March 12, 2013, Bloom's lawyer [Ford] wrote Devono demanding the Board grant Bloom flex time or, in the alternative, unpaid leave at the rate of 2-3 hours duration per week to attend Commission meetings under Policy 7-16. Ford threatens to seek relief from a court of law in the absence of failure to reach a 'reasonable accommodation." Plaintiff's Exhibit 11.

March 25, 2013 Devono responded in writing to Ford declining to change his position on Bloom's request for flex time. Plaintiff's Exhibit 12.

In March 2013 the Monongalia County Commission voted to move its meeting time from 3:00 p.m. to 1:00 p.m. for the two hour regular session because of costs and other complications incident to holding the meetings at the later hour. When school was not in session over the summer the Commission moved its meetings to 10:00 a.m. Once school resumed they moved their meetings to 1:00 p.m. Bloom attempted to get the other members of the commission to set the meeting time for 2:00 p.m. thereby permitting him to work his lunch hour at the school and get out at 2:00 p.m. instead of 3:00 p.m. in time for the meeting. The Commission declined. As of the date of the hearing before the Court, the Commission meetings are being held at 1:00 p.m. on Wednesdays.

Prior to the election Bloom did not receive correspondence or other documentation from the

Board to the effect that flex time was inapplicable to professional employees. Bloom read the flex time policy and concluded that, since it did not specifically exclude professional employees, it applied and could be used by him.

Bloom testified his supervisors knew he had left school at various times prior to announcing his intent to run for the Commission. He testified he left school to attend the youth services center, participate with Wednesday Warriors, and to work with students off campus and in hospitals. Bloom acknowledged he was working with students when he was off campus.

Bloom introduced Plaintiff's Exhibit 14 showing 66 professional employees who took absence without pay for various reasons during the period of January 10, 2010 and June 28 2013.

None of the professional employees on Exhibit 14 are guidance counselors.

Mark Myers, a Board plumber and heavy equipment operator, categorized as a service employee assigned to the paint shop, testified that he was elected to the Monongalia County Soil Conservation District as a representative. He testified that prior to his election he participated in the meetings of the Monongalia County Soil Conservation District. For that participation he took vacation or compensatory time without asking permission of his Board supervisors or giving reasons. After his election to the Monongalia County Soil Conservation District, he discussed potential conflicts between service on the District and his primary work duties with Superintendent Devono. He understood his work with the Board was his "bread and butter" and did not want to "harm" his job. Devono told him he could use comp time, absence without pay or sick leave provided it did not interfere with his work. Myers did not have to take a leave of absence. With the approval of his supervisor Myers did take time off without pay to attend the once monthly afternoon meeting of the District.

Christy Bryan Davis, a Technology Integration Specialist with the Board, testified. She does

not have any teaching or student classroom duties. Basically she is a computer systems tech. She testified she took sick days or personal leave days to travel to a few away WVU football and basketball games as the WVU cheerleaders' coach. She was unable to say how many. Some away games were during holiday weekends and therefor did not require her to take time off from her work with the school system. Her Board supervisor was aware she was the cheerleaders' coach. Davis has not had any discussions with Devono about being the coach or about taking time from her Technology Integration Specialist job to go to away games.

Janice Goodwin [Goodwin], an assistant principal at South Junior High School [South] between 1980 and 1999, testified. Duty time for guidance counselors at South was a little before school in the morning until a little after school dismissal in the afternoon. Guidance counselors were not employed after hours. Goodwin has no recollection of guidance counselors [there were two at South Junior High School] asking for or being given permission to take off from duty time because they had spent time at the school after hours.

Goodwin became assistant principal at MHS in 1999 and served in that capacity until she retired in August 2013. The principal at MHS supervised the guidance counselors. If Goodwin did not feel comfortable making a decision on requests for leave by service personnel, she went up the chain of command to the principal. Prior to Bloom "needing to go to county commission meetings," Goodwin did not know there was a flex time policy. She became aware that such a policy existed when DeSantis sent it around and explained it did not apply to professional employees. Approximately 8 years ago, Goodwin took time off during her MHS assistant principal duty hours to attend 2 or 3 of the 1:00 pm scheduled meetings of the Senior Monongalians Board [SMB] and later to attend to her failing father. She had been appointed to the SMB. She first asked her principal, DeSantis. He was hesitant in that while he did not have a problem with it, he did not know

how the central office would take it. Goodwin next approached Assistant Superintendent Talerico. She was supportive.

To the contrary, Talerico testified that Goodwin did not ask for permission to attend SMB meetings and she, Talerico, did not give Goodwin permission to leave school to attend SMB meetings.

According to Goodwin, she took the time without filling out forms or making a formal presentation to the central office. She filled out slips and used her vacation time to care for her failing father because DeSantis objected to her leaving without providing a doctor's slip. She is a member of the professional staff but has no teaching duties. She is not bound by any state statute to a certain amount of time with students. She made the decision to attend after school hours school functions instead of her Westover city council meetings because she felt it was her duty to be at her school.

Goodwin was not aware of the Board doing anything to prevent Bloom from running for the Commission. In her mind the only thing the Board is doing to interfere with Bloom's being a commissioner, is its ruling with respect to his leaving school to attend meetings in the day time. She knows of nothing that Devono is doing to Bloom in retaliation.

Goodwin speculates that there was more scrutiny of Bloom after he announced he was running for county commission. She was aware that the other counselors did not want to work with her since she was a friend of Bloom. She described it as a turf war. This was prior to Bloom running for the County Commission.

Barbara Parsons is a member of the Board. She was elected approximately 12 years ago. She has been Board President for the past 3 years. Parsons reads Policy 7-30 [Plaintiff's Exhibit 3] to: 1) be written to comply with the overtime provisions of the Fair Labor Standards Act; 2) provide

compensatory time [paragraph 7] to "service employees by mutual agreement of employee and supervisor; and 3) to limit flex time [paragraph 8] to hourly employees. Parsons concedes the policy 7-30, paragraph 8, does not contain language precluding its application to professionals including guidance counselors. Parsons reads Policy 7-16 [Plaintiff's Exhibit 2] to: 1) authorize the Board to grant an "extended leave of absence without pay to a professional or service employee for any period of time not exceeding one calendar year; 2) authorize the Human Resource Department to administer unpaid leaves of absence policy "4. A leave of Absence not to exceed four (4) years may be granted to any teacher or service employee, upon application, for the purpose of campaigning for, or serving in public office...."; and 3) not having been used to grant intermittent short term leaves of absence such as the once weekly request being made by Bloom. The Board did not address Bloom's March 12, 2013 letter request [Plaintiff's Exhibit 11] because: 1) it was addressed to Superintendent Devono and not to the Board; 2) the Board did not consider the letter as a request from Bloom to it for relief; and 3) the Board believed it was copied with the letter for informational purposes only. In the absence of a formal request from Bloom to the Board, the Board took no action and left it to the Superintendent to handle as an administrative matter.

DeSantis testified he did not believe flex time was available to professional employees. He testified he had not previously granted flex time to permit a professional employee to leave school during working hours. He testified review of the policy has confirmed his earlier belief that it is not available to professional employees. DeSantis testified that "This is not a Tom Bloom Issue. This si not an issue with the other candidate. It is a problem of setting a precedent of allowing a person to leave the school to go to another job."

### III.
### Discussion
To obtain a preliminary injunction, the plaintiff must establish:

1)      that he is likely to succeed on the merits,

2)      that he is likely to suffer irreparable harm in the absence of preliminary relief,

3)      that the balance of equities tips in his favor, and

4)      that an injunction is in the public interest.

Real Truth About Obama, Inc., v. Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), vacated
on other grounds, 130 S.Ct. 2371.

The burden is on Bloom. He must satisfy each of the four elements with a clear showing that
he is entitled to the extraordinary relief he seeks. Id. At 346.

1)      Bloom has failed to show he is likely to succeed on the merits of his federal claims.

Bloom makes the following federal claims[4]:

A)      Alleged Violation of First Amendment Right of Freedom of Speech and Freedom of
        Association/Assembly

Bloom generally contends Defendants "unreasonably impeded and interfered" with his right
to seek and campaign for a seat on the county commission and once elected retaliated against him
by denying him the opportunity to exercise his rights of free speech and freedom of assembly by
giving him time off of his school duties to attend county commission meetings. DE 3.

The hearing evidence establishes there was no imposition on Bloom's right to file for or
campaign for public office. There is no evidence of record that supports a conclusion that any of
Defendants interfered with Bloom's announcing his pre-candidacy for Commissioner. There is no
evidence of record that any of the Defendants interfered with Bloom's filing to run for the office of
county commissioner.   There is no evidence of record that any of the Defendants interfered with
Bloom's campaigning for the office of county commissioner. To the contrary, Bloom's witnesses

---

[4]The undersigned need not discuss Bloom's state claims.

and Bloom himself testified there was no such interference at any stage of the process of his election to the office of county commissioner.

Accordingly, the undersigned concludes Bloom's First Amendment Freedom of Speech and Freedom of Assembly Claims derive from the Board's post election denial of his request for time off to attend commission meetings during school hours. They do not derive from a claim that the Board intends to prevent any specific speech or even general speech by denying Bloom's request. Instead, any alleged deprivation of speech and right of assembly is incidental to and a sequella of the denial of the request for time off school to attend commission meetings.

The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

First Amendment protection is accorded to statements by public officials on matters of public concern even when those statements are directed at the nominal superiors of the official. Bloom relies on <u>Pickering v. Board of Ed. Of Tp. High School Dist. 205, Will County, Illinios</u>, 391 U.S. 563, 574, 88 S.Ct. 1731 (1968). for his proposition that "public employees are entitled to protection from firings, demotions and other adverse employment consequences resulting from the exercise of their free speech rights, as well as other First Amendment rights." DE 12, p. 7. Pickering was discharged from his employment as a teacher because he wrote articles criticizing the Board of Education and administrative staff of mismanagement of school bonds and bond funds. Recognizing Pickering's employment as a teacher was only tangentially involved in his speech, the Court treated

him more as an individual[5] than a public employee and held: "...that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.*

Pursuant to <u>Pickering</u>, "two inquiries guide interpretation of the constitutional protections accorded to public employee speech: the first requires determining whether the employee spoke as a citizen on a matter of public concern; if not, the employee has no First Amendment cause of action based on the government employer's reaction to the speech, but if the answer is yes, the possibility of a First Amendment claim arises, and the question then becomes whether the government employer had an adequate justification for treating the employee differently from any other member of the general public."

To determine whether a public employee such as Bloom has a cause of action under §1983 for violation of his First Amendment right to free speech, the Court must balance "the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*. This test requires the Court to first determine whether, after accepting all of Bloom's well-pleaded allegations in his Complaint as true and drawing all reasonable factual inferences from those facts in his favor, Bloom's alleged First Amendment violations were a consequence of his speech as a citizen concerning a matter of public concern or as an employee

---

[5] "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.,* at 568. In <u>Pickering</u>, the Court found the teacher's speech was not shown nor could "be presumed to have in any way impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally. *Id.,* at 572-573.

about a matter related to his employment contract or other personal interest. If the Court determines that Bloom's claims center on a matter of private rather than public concern, then the analysis stops there and Bloom does not have a viable First Amendment claim. If, however, the Court determines that Bloom's claims center on a matter of public concern, then the Court must determine whether Bloom's interest in speaking up on the matter of public concern outweighs the Board's interest in providing effective and efficient services to the public. _Id_.

"Speech involves a matter of public concern if it affects the social, political, or general well-being of a community." Edwards v. City of Goldsboro, 178 F.3d 231, 246 (4th Cir. 1999). "Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the first amendment. _Id_. The public concern inquiry rests on "whether the public or the community is likely to be truly concerned with or interested in the particular expression or whether it is more properly viewed as a private matter between employer and employee." Berger v. Battaglia, 779 F.2d 992 (4th Cir. 1985)[6]. The inquiry turns on an analysis of the content, context and form of the employee's speech.

Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S.Ct. 1951 (2006). Cabellos was an deputy district attorney for the Los Angeles County, California. A defense attorney contacted him concerning some alleged erroneous averments in a search warrant affidavit. Ceballos conducted his own review and determined there were erroneous averments. He reported the same to his superiors. Notwithstanding, his superiors proceeded with the prosecution. Ceballos was removed from his

---

[6]"Public employer disciplinary action against police officer who performed in blackface while off duty was not justified under First Amendment freedom of speech clause on ground of perceived threat to external operations and relationships caused not by the officer's speech itself but by threatened reaction to it by offended segments of the public."

position, assigned a different duty and was denied a promotion. Ceballos filed an unsuccessful grievance followed by a lawsuit contending he was being punished by his public employer for the exercise of his freedom of speech right. Finding that Caballos' speech (report to his superiors) was made pursuant to his duties as a calendar deputy district attorney, the Court held: "When public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id*. At 410.

Edwards v. City of Goldsboro, *supra*, specifically held dismissal of police officer who taught concealed carry firearms safety course because the City concluded it sent the wrong public message, violated officer's interest in free speech. The court held the alleged speech was a matter of public concern; officer's interest in his alleged speech outweighed city's interest in efficiency; and suspension allegedly based on teaching of course violated officer's associational rights.

It must be first noted that unlike Bloom, Edwards was teaching the concealed carry firearms safety course during his off duty hours. Second, the City's sole basis for denying Edwards' request was the City's view that "carrying concealed weapons is a very sensitive and controversial issue." *Id*. at 239. Third, Edwards involved specific speech whereas there is no specific speech at issue. With respect to Edwards' §1983 claim, he contended "Defendants intentionally, willfully and maliciously singled him out for adverse discriminatory treatment, 'because of the content of his firearms course and advocacy, because of Hill's personal and political zeal to oppose the lawful possession of firearms and because of Hill's desire to promote his own personal political agenda." *Id*. at 240. There is no evidence to support any conclusion that Bloom was singled out for adverse discriminatory treatment because of any named Defendant's personal and political opposition to a stated position taken by Bloom on any public issue.

In the instant case, taking all of Bloom's well pleaded allegations as true and drawing all reasonable factual inferences from them in his favor, the undersigned concludes that Bloom fails to establish that those claims center on a matter or matters of public concern or public importance. Simply stated, there is no speech at issue which is or could be a matter of public concern. There is no evidence that Bloom is being denied time off work to attend county commission meetings because he has made or is making statements on issues of public concern. Bloom is a public employee. Any similarity with <u>Pickering</u> or <u>Ceballos</u> ends there. Bloom has made no speech, oral or written, at the County Commission or in his bid for election to the Commission which in any way implicates his employer. Bloom provides no causal connection between speech, the content of any speech, the context of any speech or the form of any speech and the Board's refusal to give him time off to attend commission meetings. There is no evidence that the Board retaliated against Bloom due to speech he engaged in or may engage in through his role with the Commission. The Board has not threatened Bloom with disciplinary action for having run for and been elected to the Commission.

Bloom implies and speculates that Devono is denying him time off work to attend Commission meetings because Devono wanted another candidate to win the election. Absent rank speculation, Bloom's own testimony nor that of his witnesses support such an allegation or conclusion.

Bloom argues his election to the public office of county commissioner requires his attendance at meetings and the Board's denial of his request for time from work to attend those meetings impedes his right to speak and attend the meetings. He also contends the Board's action deprives those who elected him of their right to have their representative present and heard at the meetings.

The undersigned concludes that the pleadings and facts presented at the hearing show that the dispute between Bloom and his employer, the Board, is not about Bloom holding a seat on the

Commission. Instead it is about the Board's concern with Bloom's ability to adequately fulfill his duties as guidance counselor at MHS and tend to the 400 students charged to him.

Even if a matter of public concern was at the center of Bloom's claims, those claims would still fail. Bloom has not established that his alleged First Amendment interest outweighs the Board's interests in having a guidance counselor available for students at all times of the school day.

Bloom concedes "Pickering and its progeny ... recognizes that the State, as an employer, has an interest in the efficient and orderly operation of its affairs that must be balanced with the public employees' right to free speech. Accordingly, the court must balance 'the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." DE 12, p. 7 citing Pickering at 568; see also Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684 (1983).

The Board presents strong evidence that it has a compelling interest in making sure MHS has sufficient guidance counselors present at all times during the school day. It presents strong evidence that to permit Bloom to be gone from the school day to attend to his duties as a county commissioner would leave his assigned 400 students without a counselor who is familiar with them and their needs. It presents strong evidence that the other counselors at MHS have expressed their unwillingness to cover for Bloom during his absences to attend to another job. It is axiomatic that to permit Bloom to leave school to serve on the Commission adversely impacts the morale of the guidance counselors at MHS. It presents strong evidence that to permit Bloom to leave school during the duty day will disrupt the efficiency of the services it performs for the students and public through its employees.

Bloom would have the Court believe that other professionals have been permitted to use flex and comp time to attend to outside of school matters. However, the evidence is that no such permission has been granted to guidance counselors. Guidance counselors are subject to W.Va.

Code Ch. 18, Art. 5, Sec. 18b which requires them to spend 75% of their work day towards counseling with students. This statute does not permit guidance counselors to be gone from the school during the remaining 25% of their work day. They must spend 100% of their work day performing their duties. 75% of those duties are mandated to be counseling with students. This shows the importance the West Virginia legislature placed on the work being performed by guidance counselors. Based on the testimony of Commissioner Callen, he favors Commission meetings being held at 10:00 am to permit the work of the Commission to be completed during the normal work day hours. It is apparent from the history of this case that Bloom cannot control when the Commission meetings will be held. He is one vote out of three. It is apparent from the testimony of Callen that Bloom greatly underestimates the time it takes to conduct the work of the Commission on a weekly basis. For Bloom to be gone from MHS an hour or more per week to attend to the work of the Commission is an hour or more that Bloom is not available on site to attend to a student in crisis. Such student would have to wait for Bloom to return which may be too late. In short, the interest of the State, in this case the Board as an employer, in promoting the efficiency of the public services it performs to the students, their parents, and the public in general through its employees outweighs any interest of the [employee], in this case Bloom, as a citizen, in commenting upon matters of public concern. Pickering at 568.

Bloom also alleges that the Board violated his First Amendment right to freedom of association. (Dkt. No. 1 at 11). Bloom has failed to clearly establish that he is likely to succeed on his freedom of association claim and, thus, should be denied a preliminary injunction based on this issue.

Again, Bloom has not sufficiently explained how the Board has and continues to violate his freedom of association. The Board did not interfere with Bloom's run for office . The Board is not

requiring Bloom to relinquish his position with the County Commission. Thus, Bloom's freedom of association claim seems to rest on the Board's refusal to allow him to have time off from his school duties to participate in County Commission meetings and activities.

Bloom's freedom of association claim parallels his free speech claim. Courts have recognized that "the right to associate in order to express one's views is 'inseparable' from the right to speak freely." Cromer v. Brown, 88 F.3d 1315, 1331 (4th Cir. 1996) (quoting Thomas v. Collins, 323 U.S. 516, 530 (1945)). However, "as in the public employee freedom of speech context, a public employee's corresponding right to freedom of association is not absolute. Logically, the limitations on a public employee's right to associate are 'closely analogous' to the limitations on his right to speak." Edwards, 178 F.3d at 249.

The Fourth Circuit has also employed the Pickering analysis in order to determine whether plaintiffs have a viable freedom of association claim. Id. Thus, the Court must first determine whether Bloom's freedom of association claim involves a matter of public concern, and if so, whether Bloom's interest outweighs the interest of the Board.

Bloom's freedom of association claim arguably involves a matter of public concern. While it is similar to Bloom's freedom of speech claim in that it appears to deal more with a private matter between employer and employee, Bloom can argue that his right to attend County Commission meetings and activities is a matter of public concern in that he would be discussing issues relevant to the public at those meetings.

Despite the fact that Bloom's attendance at County Commission meetings arguably involves a matter of public concern, it is still not clear that the Board has violated Bloom's right to freedom of association. There is no allegation that the Board is telling Bloom he cannot be part of the County Commission. Instead, it has told him that he is expected to perform his duties as a school counselor;

that he cannot use flex time or comp time to be gone from school to attend to duties at the Commission; and he therefore has to perform his County Commission duties outside of school hours

Additionally, for the reasons mentioned above in the freedom of speech analysis, Bloom's interest in freely associating with the County Commission does not outweigh the Board's interest in having Bloom present at the school at all times. Thus, Bloom has not presented the Court with a viable § 1983 claim against the Board for violating his First Amendment right to free association.

Bloom's dilemma: how to fulfill his duties as a publicly elected commissioner when the Commission won't change meetings to a time in the evening which is not in conflict with Blooms duties as a guidance counselor, is a dilemma wholly of Bloom's own creation.

B)     Alleged Violation of Fourteenth Amendment Rights

In his Complaint, Bloom alleges that, by denying him "the opportunity to use flex time or to take unpaid leave of absence to attend weekly meetings of the Monongalia County Commission or to attend to other business of the Monongalia County Commission during school hours, Defendants Devono and the Board have deprived, and are depriving, Plaintiff Bloom of his rights to due process and equal protection of the law secured by the Fourteenth amendment to the United States Constitution, by 42 U.S.C. § 1983, and by Article III, § 10 of the West Virginia Constitution." (Dkt. No. 1 at 76). Bloom has failed to establish by a clear showing that he is likely to succeed on his Fourteenth Amendment claim and, thus, should be denied a preliminary injunction based on this issue.

Bloom does not base his Fourteenth Amendment equal protection claim on being a member of a protected class that is being targeted for discrimination. Rather, he asserts that he is being singled out and treated differently than other employees for reasons not fully articulated in his Complaint. Thus, Bloom appears to be basing his equal protection claims on a "class of one", which

is a situation where the plaintiff alleges that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." . See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). The purpose behind utilizing the equal protection clause to protect "classes of one" is to "secure every person within the State's jurisdiction against intentional and arbitrary discrimination ..." Id. Such cases receive rational basis scrutiny, and thus require a rational basis for the disparate treatment to exist. See Engquist v. Oregon Dep't of Agr., 553 U.S. 591, 602 (2008).

In order to pass rational basis scrutiny, Bloom must establish that the Boards' denial of his request to participate in County Commission activities during school hours was not "rationally related to a legitimate government purpose." See Williamson v. Lee Optical, 348 U.S. 486 (1955). A legitimate purpose can be any conceivable goal which is not prohibited by the Constitution. Id. at 487. Rational basis scrutiny is the least demanding level of scrutiny for equal protection purposes, and is, therefore, difficult for a plaintiff to meet.

In his complaint, Bloom claims that:

> There is no rational basis for Defendant School Board and/or Defendant Devono to restrict Plaintiff Bloom from being granted flextime or being allowed to take unpaid leave of absence to attend meetings of the Monongalia County Commission or to attend to other business of the Monongalia County Commission during school hours while flexibility is inherent in the job duties of a school guidance counselor, while allowing other employees to use flextime or take unpaid late leave of absence to attend to non-school business during school hours and/or when the efficiency of the public services performed by Defendant School Board are not affected.

(Dkt. No. 1 at 15). The defendants, on the other hand, argue they do have a rational basis for denying Bloom's request to leave during school hours to take part in County Commission meetings and activities.

They assert and the evidence establishes that granting Bloom's request would pose a "material hardship to the operation of the school and to the students." (Dkt. No. 17 at 24). They go on to argue and the evidence establishes that granting the request would contradict W.Va. Code § 18-5-18b, which requires school counselors specifically to devote 75% of their work day towards counseling. Defendants argue that this statute was enacted by the West Virginia Legislature due to a "compelling need for school counselors to be present for a large percentage of the school day in order to attend to the orderly operation of the school and its students." Thus, defendants argue that it was Bloom's unique role as guidance counselor that motivated their denial of Bloom's request.

Defendants' explanation does, in fact, provide the Court with a rational basis for their denial of Bloom's request. Guidance counselors are different than other school employees such as teachers and coaches in that they do not have concrete schedules or responsibilities. Guidance counselors may be called on at all times of the day for a variety of reasons in order to tend to students' needs. If, for instance, a student seeks Bloom's advice or assistance for a social or academic issue during the time when he is gone for a County Commission meeting, that student would be harmed by Bloom's absence. None of the employees Bloom mentions in his complaint or who are named or identified in the evidence taken during the hearing as being allowed to leave school early to attend outside school activities are guidance counselors. (Dkt. No. 1 at 9). Furthermore, the instances that Bloom cites as being times in the past where he was able to have a flexible schedule to perform other duties–coaching, supervising school dances, meeting with parents, etc.–were all tasks related to his guidance counselor duties. Thus, defendants validly argue and prove that they have a rational basis to deny a guidance counselor, as opposed to other school employees, the right to leave during school hours due to the unique nature of their job.

Additionally, this case is factually different from "class of one" equal protection cases, where

courts have found that no rational basis existed for the disparate treatment. In those cases, the defendants were not able to provide any constitutional explanation as to why they treated the plaintiff differently from others similarly situated. See Village of Willowbrook, 528 U.S. at 562 (2000); Sioux City Bridge Co. v. Dakota County, 260 U.S. 441 (1923); Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty., 488 U.S. 336 (1989). Here, by contrast, the defendant can and does provide a constitutional reason as to why Bloom is being treated differently from other employees- namely, his unique role as guidance counselor.

Thus, the Court should decline to grant Bloom a preliminary injunction based on his Fourteenth Amendment claim, since he has failed to establish by a clear showing that his claim is likely to succeed on the merits.

C)      Alleged Violation of 42 U.S.C. §1983 and Qualified Immunity

To the extent Bloom alleges a violation of 42 U.S.C. §1983, the following discussion of such a claim in regard to the qualified immunity affirmative defense is relevant.

Before deciding whether a qualified immunity defense is applicable, the Court must decide whether there was conduct by the Board that violated clearly established statutory or constitutional rights enjoyed by Bloom.

Qualified immunity is an affirmative defense to Bloom's § 1983 claims against the Board. Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir.), cert. denied, 510 U.S. 996 (1993). In discussing qualified immunity, the United States Supreme Court has stated that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitgerald, 457 U.S. 800, 818 (1982); Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992). Discretionary functions include actions that were

"undertaken pursuant to the performance of [the defendant's] duties and [were] within the scope of his authority." Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994).

Qualified immunity protects all but "the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335 (1986).

To determine whether qualified immunity exists, the Court must first determine whether a constitutional or statutory right was deprived, then determine whether the right was clearly established at the time of the violation, and whether a reasonable person in the defendant's position would have understood that his actions violated that right. Saucier v. Katz, 533 U.S. 194 (2001); Doe v. Broderick, 225 F. 3d 440, 454-455 (4th Cir. 2000). Although Saucier originally mandated that this two-step inquiry be done in this order, the Supreme Court later ruled that "judges of lower courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity test should be addressed first in light of the particular circumstances of the case at hand." Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 818 (2009). This holding gives lower courts the discretion to decide in which order they wish to conduct the qualified immunity analysis.

As described in the prevision sections, Bloom has failed to prove that the Board has deprived him of any constitutional right. There is no assertion by Bloom that the Board violated a clearly established statutory right. Thus, given that Bloom has failed to satisfy the a necessary prong of the qualified immunity inquiry, the defendants should receive qualified immunity to any §1983 claim.

2)      that he is likely to suffer irreparable harm in the absence of preliminary relief

Bloom has not clearly shown he will suffer irreparable harm in the absence of preliminary relief. Bloom ran for the Commission seat on a platform that included his vision that Commission meetings should be held at night. He represented to his supervisor, DeSantis, that he could get the

meeting time changed to the evening time. After his election the Commission changed its meeting times multiple times to accommodate Bloom. It was the Commission that changed its meeting time to a time that prevents Bloom from fully attending without missing time from his guidance counselor duties at MHS. The Board never changes its school schedule or the schedule of its guidance counselors. Because the Commission, a Commission on which Bloom is a voting member, changed its schedule to suit itself, Bloom now wants the Board to accommodate him and in the process upset the orderly operation of the other counselors and staff at MHS in their delivery of services to the students, parents and public served by the Board. By not giving Bloom the relief he requests, Bloom is not caused irreparable harm. He is still a duly elected and sworn in member of the County Commission. He can still work with the other Commissioners to establish a time when he can attend meetings without taking time off from school. He can still represent the constituents who elected him. He can elect - choose to do his commission duties as opposed to work as a guidance counselor. He can elect - choose to withdraw from the Commission and continue to work as a guidance counselor.

3)      that the balance of equities tips in his favor

As is apparent from the foregoing analysis, the undersigned does not find the balance of equities tipping in favor of Bloom. To the contrary, for the reasons stated herein the undersigned finds the balance of equities tips in favor of the Board, the children and parents and public it serves.

4)      that an injunction is in the public interest

Based on the foregoing analysis the undersigned finds that Bloom has not clearly shown that an injunction is in the public interest. To the contrary, if the undersigned were to recommend an injunction under the facts and law applicable to this case, not only would it be a violation of the law as applied, it would invite anyone who claims to have in interest in speaking on a matter of public

concern to demand their employer let them leave work to do so. As argued, this would mean that the McDonald's employee or the local policeman or the local hospital emergency room doctor or nurse could unilaterally leave his or her job during work hours, without repercussion from the employer, to attend a rally in protest of a local exotic book store or club. Such a protest may be laudable and in the public interest. However, an injunction to force the employer to suffer it with the concomitant disruption in the employer's business or services is not in the public interest. So it is with Bloom's request. The undersigned sees no public interest in resolving the dilemma Bloom created for himself by enjoining the Board with the concomitant disruption such an injunction would cause on the operations and services of the Board.

## IV.
### Recommended Decision

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that Bloom's request for preliminary injunctive relief be **DENIED**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to

counsel of record.

Respectfully submitted this 2nd day of October 2013.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE